UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2022 NOV 14 PM 3:54

LOUIS D., )
)
Plaintiff, )
)
v. ) Case No. 2:21-cv-00238
)
COMMISSIONER OF SOCIAL SECURITY, )
)
Defendant. )

**OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, DENYING THE COMMISSIONER'S MOTION TO
AFFIRM, AND REMANDING FOR FURTHER PROCEEDINGS**
(Docs. 6 & 7)

Plaintiff Louis Duclerc ("Plaintiff") is a claimant for Social Security Disability Insurance Benefits ("DIB") under the Social Security Act ("SSA") and brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the "Commissioner") that he is not disabled.[1] (Doc. 6.) The Commissioner moves to affirm. (Doc. 7.) The pending motions were taken under advisement on May 16, 2022.

After his application for DIB was denied initially and on reconsideration by the Social Security Administration, Administrative Law Judge ("ALJ") Dory Sutker found Plaintiff ineligible for benefits based on a conclusion that he can perform jobs that exist in significant numbers in the national economy and was therefore not disabled.

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Plaintiff was born on June 7, 1973 and has previously worked as a communications technician, health technician, corrections officer, Emergency Medical Technician ("EMT"), police officer, and in air base security. He was a first responder during the September 11, 2001 terrorist attacks in New York City.

Plaintiff identifies two errors in the disability determination: (1) the ALJ improperly substituted her lay opinion on issues reserved for medical experts; and (2) the ALJ's determination that Dr. Allison Christie's opinion was unpersuasive and that the state agency physicians' opinions were persuasive is not supported by substantial evidence. Plaintiff seeks a reversal of ALJ Sutker's denial of benefits and a remand for further evaluation of the medical evidence.

Plaintiff is represented by Craig A. Jarvis, Esq. Special Assistant United States Attorney Natasha Oeltjen represents the Commissioner.

## I. Procedural History.

Plaintiff filed his initial application for DIB on October 24, 2019, claiming a disability onset date of April 1, 2018 "because of the combination of the various impairments he has developed over the years[.]" (Doc. 6-1 at 1.) He alleges the following disabling conditions: cervical radiculopathy; lumbar disc disease; cervical disc disease; angina pectoris; lower back, neck, and right shoulder pain; chronic cluster headaches; migraines; respiratory complications; advanced arthritis; digestive disorders; hypertension; sinusitis; bronchitis; asthma; chronic obstructive pulmonary disease ("COPD"); post-traumatic stress disorder ("PTSD"); carpal tunnel syndrome; and lymphoma. His application was denied on January 7, 2020 and upon reconsideration on April 24, 2020. Plaintiff filed a request for a hearing, which was held before ALJ Sutker via telephone on July 29, 2020. Plaintiff appeared and was represented by counsel. Vocational Expert ("VE") Patricia Scutt also appeared and testified at the hearing.

On August 28, 2020, ALJ Sutker issued an unfavorable decision, which Plaintiff timely appealed. The Appeals Council denied review on August 4, 2021. As a result, the ALJ's disability determination stands as the Commissioner's final decision.

## II.   ALJ Sutker's August 28, 2020 Decision.

In order to receive DIB under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess*, 537 F.3d at 128 (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

At Step One, ALJ Sutker found Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date of April 1, 2018 through his date last insured of September 30, 2019. At Step Two, she concluded Plaintiff had the following severe impairments through his date last insured: degenerative disc disease, cutaneous lymphoma, mild carpal tunnel syndrome, asthma/allergies, and a right labral tear and osteoarthritis.

While Plaintiff testified that he suffers from migraine headaches, the ALJ noted "there is no evidence of more than minimal related functional deficits on a consistent basis" and that "[t]he treatment record contains infrequent references to recurrent

3

headaches with little to no evidence indicating persistent issues during the period at issue." (AR 101.) As a result, the ALJ "limited [Plaintiff] to indoor environments with no more than moderate noise level in order to avoid triggering his alleged headaches." *Id.* The ALJ further observed that while Plaintiff underwent an initial assessment for counseling in September of 2017 related to his work as an EMT during the September 11, 2001 attacks, "[t]here is no evidence of subsequent mental health treatment until October 2019" and thus "no record of any mental health treatment during the period at issue." *Id.*

At Step Three, ALJ Sutker found Plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the" Listings through his date last insured. *Id.* The ALJ determined that Plaintiff's degenerative disc disease "does not meet Listing 1.04 regarding disorders of the spine because he does not experience the requisite neurological deficits" and "[t]here is no evidence of the combination of nerve root compression, limitation of motion, motor loss, sensory or reflex loss, and both sitting and supine positive straight-leg raising as required by [L]isting 1.04A." *Id.* In addition, she found "the record lacks confirmed spinal arachnoiditis with severe burning or dysesthesia or the inability to ambulate effectively as defined by the regulations to meet [L]istings 1.04B or 1.04C." *Id.* The ALJ stated that Plaintiff's right shoulder impairment "does not meet Listing 1.02 regarding major dysfunction of joints" as "there is no evidence of gross anatomical deformity[,]" nor did it meet the criteria for Listing 14.09 because Plaintiff exhibited no history of joint pain, swelling, tenderness, ankylosis, or spondylitis. (AR 101.)

Plaintiff's alleged asthma was deemed insufficient to meet Listing 3.03 because "he does not experience the requisite frequency of attacks or pulmonary obstruction." *Id.* at 102. ALJ Sutker further found that Plaintiff's "mild carpal tunnel syndrome [did] not meet Listing 11.14 because the evidence does not demonstrate disorganization of motor function in two extremities or marked mental deficits." *Id.* Finally, she held that Plaintiff's cutaneous lymphoma did not meet Listing 13.05 "because the evidence does not demonstrate an aggressive lymphoma that is persistent or recurrent following initial

4

anticancer therapy or indolent lymphoma requiring initiation of more than one anticancer treatment regimen with[in] a period of [twelve] months." *Id.*

At Step Four, ALJ Sutker determined that, through his date last insured, Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 404.1567(b) except he must avoid all exposure to hazards such as unprotected heights or dangerous moving machinery. He must avoid concentrated exposure to dust, fumes, odors, gases, and other pulmonary irritants. He cannot drive on the job. He needs an indoor environment with no more than moderate noise level. He can never climb ladders, ropes, or scaffolds. He can never crawl but could frequently balance. He can occasionally climb ramps and stairs, stoop, kneel, and crouch. He is capable of frequent handling and fingering. He is able to occasionally reach overhead.

*Id.*

At the ALJ's hearing, both ALJ Sutker and Plaintiff's attorney asked the VE to address certain hypotheticals, including whether a person who was only able to lift ten pounds occasionally and could never kneel with Plaintiff's RFC could be employed. The VE testified that, under this hypothetical, no sedentary occupations could be performed. If the person could occasionally kneel, but was limited to occasional handling, fingering, and reaching, the VE again indicated that all sedentary occupations would be eliminated. *Id.* at 55-56.

In light of Plaintiff's RFC, the ALJ concluded Plaintiff could not perform his past relevant work as a communications technician, health technician, corrections officer, EMT, or air base security employee. The ALJ noted that Plaintiff was forty-six years old, making him "a younger individual" on his date last insured, and that Plaintiff had "at least a high school education[.]" *Id.* at 106. Considering Plaintiff's age, education, work experience, and RFC, ALJ Sutker determined at Step Five based on the VE's testimony that jobs existed in significant numbers in the national economy which Plaintiff could have performed, including electrode cleaner, garment sorter, lens latcher, ampoule sealer, final optical goods assembler, and egg processor. As a result, the ALJ concluded Plaintiff was not disabled through his date last insured.

5

## III. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted) (first alteration in original). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

6

### B.   Whether the ALJ Improperly Substituted Her Own Assessment of the Medical Evidence.

Plaintiff contends that ALJ Sutker "substitute[d] her own lay opinion on issues that are within the competence of the medical experts" and thus engaged in an improper interpretation of the medical evidence when formulating his RFC. (Doc. 6 at 3.) He points out that while the ALJ purports to rely on the medical opinions of the state agency physicians, her analysis goes beyond the functional limitations they identified and instead utilizes a "common[-]sense appraisal" which constitutes legal error. *Id.* (internal quotation marks omitted).

An RFC determination represents "the most [a claimant] can still do despite [their] limitations[,]" and is determined based on "all the relevant evidence" in the record. 20 C.F.R. § 416.945(a)(1). "In deciding a disability claim, an ALJ is tasked with 'weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.'" *Benman v. Comm'r of Soc. Sec.*, 350 F. Supp. 3d 252, 256-57 (W.D.N.Y. 2018) (alterations in original) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)). This is because "[a]n RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ, as the Commissioner's regulations make clear." *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021) (citing 20 C.F.R. § 404.1527(d)(2)). As a result, a medical opinion "providing the specific restrictions reflected in [an] ALJ's RFC determination . . . is not required when 'the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity.'" *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x. 108, 109 (2d Cir. 2020) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (third alteration in original)).

"[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). However, "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for . . . any competent medical opinion." *Greek v. Colvin*, 802

7

F.3d 370, 375 (2d Cir. 2015) (citation omitted); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (observing that "it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion") (internal quotation marks and citation omitted). In other words, although "an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *Balsamo*, 142 F.3d at 81 (internal quotation marks omitted) (quoting *McBrayer v. Sec'y of Health and Hum. Servs.*, 712 F.2d 795, 799 (2d Cir.1983)) (alterations in original).

Federal regulations indicate that the ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). When evaluating the persuasiveness of medical opinions, the most important factors the ALJ will consider are "supportability . . . and consistency[.]" *Id.* ALJs must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found those records. *Id.* at (a), (b).

On July 11, 2016, Plaintiff reported bronchitis after working as a first responder EMT during the World Trade Center attacks and received Advair to treat his symptoms. Although he initially improved, his symptoms worsened after moving to Vermont. A spirometry test indicated that Plaintiff experienced restriction, but also that his lung function had not changed significantly since his last visit. His FVC was 76% of predicted at 3.88. His FEV1 was 80% of predicted at 3.29. His FEV1/FVC was 105% of predicted at 84.7. (AR 487.) Plaintiff then resumed medication for his asthma and shortness of breath.

On July 19, 2016, Plaintiff received a lumbar MRI, which showed "[e]arly multilevel lumbar spine degenerative disc disease and facet disease at L2/L3, L3/L4[,] and L5/S1[.]" *Id.* at 520. The MRI additionally showed a "small disc bulge with a right paracentral annular fissure[]" that "slightly abutt[ed] the adjacent right S1 nerve root

8

within the mildly narrowed spinal canal" at L5/S1. *Id.* There was also a "small eccentric left disc bulge" at L2-3 "with moderate left neural foraminal narrowing." *Id.*

On October 11, 2016, Plaintiff was treated by rheumatologist Scott D. Legunn, MD for neck pain and arthralgias. Dr. Legunn noted "[d]iffuse polyarthralgia involving the shoulders, neck, left elbow, knees and ankles." *Id.* A physical examination showed "nail pitting, synovial fullness of the right fourth MCP, acromioclavicular joint [crepitus,] and bilateral ankle warmth." *Id.* Dr. Legunn indicated that these symptoms were likely caused by "primary degenerative osteoarthritis and degenerative disc disease with medial epicondylitis." (AR 520.) However, due to Plaintiff's history of chemical exposure during the September 11 terrorist attacks and his ankle warmth, Dr. Legunn speculated that Plaintiff might have an "early autoimmune disease[.]" *Id.* Dr. Legunn recommended that Plaintiff use an elbow brace to manage his epicondylitis.

On May 1, 2017, Plaintiff received x-rays of his knees which showed "mild joint space narrowing in the medial compartment" of the left knee and "minimal medial compartment narrowing" on his right knee. *Id.* at 661.

On May 5, 2017, Plaintiff reported that he often missed work due to frequent sinus infections and described "constant sinus pressure and pain" that seemed to provoke migraine headaches. *Id.* at 375. He also experienced a cough, chest tightness, and shortness of breath resulting from these infections. A spirometry showed restriction, which Plaintiff's provider attributed to Plaintiff's obesity.

Approximately one month later, on June 12, 2017, another spirometry showed that Plaintiff's FVC was 71% of predicted at 3.61. His FEV1 was 79% of predicted at 3.23. His FEV1/FVC was 111% of predicted at 89.3. *Id.* at 382.

On June 21, 2017, Dr. Legunn indicated that Plaintiff's workup for autoimmune etiologies was negative but that Plaintiff was positive for fecal occult blood and had been evaluated by a gastroenterologist. An x-ray of Plaintiff's left knee indicated mild degenerative osteoarthritis, as well as "a small enthesophyte . . . at the attachment of the quadriceps tendon." *Id.* at 592. Dr. Legunn "continue[d] to favor an early seronegative spondyloarthropathy." (AR 592.) At this visit, Dr. Legunn indicated that Plaintiff also

9

suffered from right rotator cuff syndrome, degenerative disc disease in the lumbar and cervical spine, possible tendinitis or enthesitis in his left elbow, and bilateral knee pain that worsened with going down stairs.

In February of 2018, Plaintiff slipped and fell onto his right side while working on a job. *Id.* at 1038. He reported "an aching sensation over the mid upper biceps region[,]" along with "catching and clicking when he elevate[d] his arm[,]" and significant pain. *Id.* Plaintiff's shoulder was positive for the Hawkin impingement test, Neer impingement test, O'Brien active compression test, Speed's test, cross-body a[d]duction impingement sign, and internal impingement test. Plaintiff's strength was reduced on the right shoulder as compared with his left shoulder, especially when measuring contraction of the infraspinatus. Imaging of Plaintiff's right shoulder "demonstrate[d] calcification over the greater tuberosity" likely "consistent with a calcific tendinitis[,] mild degenerative changes of the [A.C.] joint[,]" and "minimal degenerative changes of the glenohumeral joint[,]" but "no acute fractures." *Id.* at 1039. Plaintiff was diagnosed with "[r]ight shoulder calcific tendinitis" and "[i]mpingement of [the] right shoulder[.]" *Id.*

Plaintiff received an MRI of his right shoulder on March 16, 2018. The image showed evidence of a labral tear and "adhesive capsulitis." *Id.* at 1080-81. Approximately two weeks later, an April 2, 2018 x-ray of Plaintiff's lumbar spine showed "[h]ypertrophy of the facet joints . . . at L4-L5 and L5-S1." (AR 1234.) Plaintiff's gait was described as "normal" on that date. *Id.* at 1033. An April 16, 2018 MRI of Plaintiff's cervical spine showed "[c]ervical degenerative disc disease[,]" "[s]evere neural foraminal stenosis bilaterally at C5-C6 and on the right at C6-C7[,]" as well as "[c]entral spinal narrowing due to posterior disc osteophyte complexes at C5-C6 and C6-C7" and "mild associated cord impingement at the C5-C6 level." *Id.* at 1077. Five days later, on April 21, 2018, Plaintiff received an MRI of his lumbar spine which showed "[n]o evidence of herniation, central canal stenosis, or foraminal compromise[.]" *Id.* at 1076.

Plaintiff was evaluated by his primary care doctor, Allison Christie, MD, on April 30, 2018. Dr. Christie described Plaintiff's medical history as including migraine headaches, asthma, "[m]usculoskeletal discogenic [l]umbar back pain" with a right

10

"lateral bulge at L5-S1," an "annual tear," "[s]eronegative spondyloarthropathy[,]" tendinitis, capsulitis, a labral tear, "cervical degenerative disc disease" with "[c]ent[]ral spinal narrowing due to posterior disc osteophyte complexes at C5-C6 and C6-C7" found in the April MRI, "mild . . . cord impingement at [the] C5-C6 level[,]" and "[s]evere neural foraminal stenosis bilaterally at C5-C6 and on the right at C6-C7." *Id.* at 1196-97. In June of 2018, Plaintiff's gait was described as normal. *Id.* at 1028.

Plaintiff returned to Dr. Christie for an evaluation on August 10, 2018. Dr. Christie noted that Plaintiff was unable "to bend, stoop, crawl, or . . . lift heavier than 20 pounds without pain" in his neck and back. (AR 1189.) That pain made it "impossible" for Plaintiff "to perform his duties doing [residential] cable installation[] and repair[.]" *Id.* Dr. Christie described Plaintiff's gait as normal and noted that Plaintiff made "no unusual movements" and demonstrated a "regular breathing rate and effort." *Id.*

Paul L. Penar, MD evaluated Plaintiff on November 12, 2018 for hand weakness and neck pain resulting from Plaintiff's February 2018 fall. Dr. Penar noted that Plaintiff experienced "radiating pain from the neck toward the right shoulder on extension" which "increased with lateral bending to the right." *Id.* at 1014. Dr. Penar described Plaintiff's upper extremity strength as "fairly normal," and Dr. Penar did not "detect any true weakness of the lumbrical muscles[.]" *Id.* Plaintiff "had no Tinel sign over the median nerves" but reported reduced sensation "over the very tip of the right thumb and index finger." *Id.* Dr. Penar reviewed Plaintiff's April 2018 MRI and stated that it showed "significant spondylosis on the right side at C5-6 and C6-7" along with "fairly extensive foraminal narrowing[,] especially at C5-6." (AR 1015.) In his assessment notes, Dr. Penar indicated that there was "an element of shoulder pain and pathology" and also "detect[ed] a clinically significant C6 radiculopathy[,]" consistent with Plaintiff's "C5-6 protrusion." *Id.* Dr. Penar noted that "C7 [could] also cause symptoms" in the distribution described by Plaintiff, but that the hand weakness "should not be caused by a C6 or 7 radiculopathy[.]" *Id.* Dr. Penar stated that he observed "some carpal tunnel type symptoms" in both of Plaintiff's hands. *Id.* He recommended that Plaintiff receive an EMG.

11

Approximately two weeks later, Plaintiff was evaluated by John Lawlis, MD on November 28, 2018 for his shoulder pain. Dr. Lawlis diagnosed Plaintiff with a "[p]artial tear" of the "subscapularis tendon" on Plaintiff's right side, "[b]iceps tendinosis of [Plaintiff's] right shoulder[,]" "[o]steoarthritis of [the] right acromioclavicular joint[,] [c]hronic right shoulder pain[,]" and "[c]ervical radiculopathy[.]" *Id.* at 1011. Dr. Lawlis also noted that Plaintiff had a full range of motion in his elbow, wrist, and fingers, an "intact radial pulse[,]" "good capillary refill[,]" and no swelling. *Id.*

Plaintiff received an EMG on January 10, 2019. The procedure showed "evidence of bilateral, mild, median neuropathies at [Plaintiff's] wrist[,]" which the treating physician described as "supportive of the clinical diagnosis of bilateral carpal tunnel syndrome." (AR 1007.) The EMG did not show "evidence of a right cervical radiculopathy." *Id.* These findings supported "the clinical diagnosis of bilateral carpal tunnel syndrome." *Id.* at 1291.

On March 28, 2019, Plaintiff received right shoulder arthroscopic surgery for "debridement/partial rotator cuff repair[.]" *Id.* at 1002. Thereafter, Plaintiff's shoulder pain at times improved. *See id.* at 929 ("[H]e has made gains in right shoulder [range of motion.]"). On other occasions, Plaintiff's recovery was described as "up and down," and Plaintiff "continue[d] to verbalize activities that . . . resulted in sharp right shoulder pain." *Id.* at 942.

On May 1, 2019, Plaintiff experienced "significant increased pain" when he reached for an object while not wearing his sling. (AR 995.) Plaintiff experienced a reduced range of motion in his shoulder but maintained a full range of motion in his elbow and no swelling in his forearm, wrist, hand, or fingers. His treating physician described his arm as "grossly neurovascularly intact[.]" *Id.*

Approximately one month later, Plaintiff followed up with Dr. Legunn on June 5, 2019 after experiencing joint pain and swelling. Upon examination, Dr. Legunn discovered "[r]ight AC joint [crepitus] and pain upon internal rotation of the right shoulder and adduction." *Id.* at 991. Plaintiff tested positive on the Neer's and empty can tests, as well as the Finkelstein's test on the left side, and experienced tenderness along

12

his "left medial epicondyle and trapezius tendon." *Id.* Plaintiff also experienced tenderness in his hands and wrists. Dr. Legunn noted "synovial fullness[,]" "[n]ail pit[s,]" "bony hypertrophy[,]" "[m]ild thickening of the right [A]chilles tendon-calcaneal insertion[,]" and "[l]eft [A]chilles tendon tenderness." *Id.* Imaging of Plaintiff's left knee showed "[m]ild asymmetric medial joint space loss without secondary signs of degenerative disease" and "[a] small enthesophyte . . . at the quadriceps tendon attachment." *Id.* at 992. Dr. Legunn diagnosed Plaintiff with arthralgia, possibly "due to an early seronegative spondyloarthropathy" and additionally noted right rotator cuff syndrome and cervical degenerative disc disease. (AR 992-93.)

On July 10, 2019, Plaintiff reported increased pain in his shoulder after a hiking incident, during which his son tripped while holding Plaintiff's hand. Plaintiff tried to catch his son and "jerked his right arm" resulting in pain. *Id.* at 989.

One week later, on July 17, 2019, an examination of Plaintiff's cervical spine showed that it was "non-tender," that Plaintiff experienced "no pain with" range of motion, and that Plaintiff's upper right arm was not tender, swollen, or deformed. *Id.* at 988. Similarly, in August of 2019, Plaintiff had full range of motion in his elbow and experienced no swelling in his forearm, wrist, hand, or fingers.

On September 25, 2019, Plaintiff called Dr. Penar's office to schedule an appointment for ongoing neck and hand pain. Dr. Penar indicated that he wanted Plaintiff to undergo a cervical MRI before scheduling a follow-up appointment.

Five days later, Plaintiff went to the emergency room for shoulder pain on September 30, 2019, his date last insured. Plaintiff reported that his son fell from a bunk bed onto Plaintiff's shoulder, "causing him to strain to hold him up[,]" and that his symptoms had progressively worsened since then. *Id.* at 1258-59. Plaintiff's physical examination showed "no left distal sensory deficit, distal motor deficit, distal pulse deficit[,] or distal capillary refill deficit." *Id.* at 900. Once Plaintiff was discharged, his pain improved, and he was in "good condition." *Id.*

Approximately two weeks later, on October 14, 2019, Plaintiff received a cervical MRI which revealed a "right central disc herniation that produce[d] very slight flattening

13

of the ventrolateral spinal cord on the right[,]" which was "new from the previous MRI." (AR 1065.) The MRI additionally revealed "[c]entral spinal narrowing due to posterior disc osteophyte complexes at C5-6 and C6-7" and "mild associated cord impingement[.]" *Id.* at 1066. The MRI showed "[m]ultilevel neural foraminal narrowing due to uncinate spurring[,]" most significantly on "the right and the left at C5-6." *Id.* When Dr. Christie reviewed these records, she indicated that the MRI showed "stenosis along the C6 nerve root foramen" on the right side. *Id.* at 1107. Records from the same day indicated a normal range of motion of Plaintiff's spine, right joint crepitus and pain in his right shoulder, synovial fullness in his right hand along with some tenderness in his fingers, but "[n]o other significant tenderness, swelling, effusions, erythema or warmth[.]" *Id.* at 982.

On October 30, 2019, Plaintiff had a follow-up appointment with Dr. Penar for his neck and upper extremity pain since his February 2018 fall. Plaintiff reported an onset of shoulder and neck pain after catching his son from the September 30, 2019 bunk bed fall. He examined the October 14 MRI and noted "a new finding of a disc herniation at C4-5 . . . on the right side." *Id.* at 980. Dr. Penar additionally observed "a fragment of disc material extending below the disc space underneath the nerve root" and offered Plaintiff "posterior cervical decompression[.]" (AR 980.)

In his hearing with ALJ Sutker, Plaintiff described his efforts to assist with childcare but noted significant difficulties due to fatigue from medication and hand pain. By the end of 2019, Plaintiff was no longer able to grocery shop due to breathing issues.

On January 3, 2020, Plaintiff visited Robert D. Monsey, MD for a second opinion regarding his neck pain. Dr. Monsey estimated that "[t]he likelihood of significant improvement of [Plaintiff's] neck and/or arm pain with a surgical intervention . . . would be" approximately fifty percent. *Id.* at 1117. The two "discussed the importance of an ongoing exercise program to optimize function," and Dr. Monsey told Plaintiff that although he may experience pain, "he [could not] 'hurt himself' or cause damage." *Id.*

Later that same month, Plaintiff visited Dr. Christie on January 27, 2020. Dr. Christie noted that Plaintiff experienced an "increased expiratory phase" but that his

14

breathing was "normal" and that he had "[m]oderate to good air movement" and lacked "wheezes, rales, [or] rhonchi[.]" *Id.* at 1485.

On March 4, 2020, Plaintiff had a follow-up appointment with Dr. Penar wherein the two discussed Plaintiff's visit with Dr. Monsey. Plaintiff and Dr. Penar decided that Plaintiff would not undergo surgery at that point.

Approximately one month later, Plaintiff visited Diego A. Adrianzen Herrera, MD on April 7, 2020. Dr. Herrera indicated that Plaintiff was "[r]estricted in physically strenuous activity" but was "ambulatory and able to carry out work of a light or sedentary nature," such as "light house work" or "office work[.]" *Id.* at 1519.

Two weeks later, Plaintiff saw Dr. Christie on April 21, 2020. Dr. Christie noted that Plaintiff had recently been diagnosed with a "cutaneous t-cell lymphoma[,]" but indicated that the lymphoma could "be managed" and was "unlikely to cause [Plaintiff] [s]erious illness." *Id.* at 1492, 1494. Dr. Francis Cook's report included that Plaintiff had been recently diagnosed with lymphoma and described it as "[s]evere[.]" (AR 88.)[2]

Plaintiff visited Dr. Christie for a physical on July 14, 2020. Dr. Christie noted that Plaintiff had been diagnosed with "[c]utaneous T cell lymphoma" which required a diagnostic workup, "[l]umbar back pain and joint pain due to osteoarthritis, uncontrolled asthma[,]" "[m]igraine headache[s,] [s]eronegative spondyloarthropathy," and "[c]ervical degenerative disc disease at C5-7 with stenosis" which possibly required spinal surgery. *Id.* at 1159. Dr. Christie recorded Plaintiff's symptoms as including "[s]hortness of breath, difficulty walking and bending, . . . [f]atigue[,]" and "[d]ifficulty using [his] hands due to cervical radiculopathy and median neuropathy." *Id.* Additionally, Dr. Christie noted that Plaintiff had received an MRI in April of 2018 which showed "significant cervical spinal stenosis" and had also received "too many [x-rays] to list." *Id.* Dr. Christie indicated that Plaintiff could lift less than ten pounds occasionally and could lift ten to twenty pounds less than occasionally. She noted that Plaintiff could never kneel and could only stoop, crouch, crawl, balance, climb ladders, and climb stairs less than

---

[2] This record appears to be signed by both Dr. Christie and by Ellen Atkins, PhD. (AR 88-92.)

occasionally. Plaintiff could occasionally operate levers and controls with his left hand and arm but could only handle, finger, and feel objects and reach less than occasionally. Plaintiff was only able to sit for twenty minutes, stand for five minutes, and walk for fifteen minutes at a time before needing to change position. In an eight-hour workday, Plaintiff could sit for about three hours and stand and walk for about two. Dr. Christie indicated that Plaintiff's symptoms would cause him to be "off task doing simple work" due to "[f]atigue, sleepiness . . . , trouble concentrating due to pain," and "difficulty breathing if walking." *Id.* at 1161. As a result, Dr. Christie estimated that Plaintiff would be off task for twenty percent or more of the workday. Dr. Christie noted that Plaintiff had experienced "significant disability since 2017 when his seronegative spondyloarthropathy worsened," along with his worsening spinal stenosis around the same time. *Id.* at 1162. She stated that Plaintiff had difficulty breathing due to asthma for at least ten years related to his chemical exposure as a first responder during the September 11 terrorist attacks. Finally, Dr. Christie indicated that her medical opinion was "based on . . . laboratory testing and imaging[,]" statements from Plaintiff's specialists, and clinical records. (AR 1162.)

      The ALJ observed that the opinion of Dr. Herrera, who treated Plaintiff's lymphoma, lacked "specific functional limitations" and therefore was only "partially persuasive." *Id.* at 105. She further deemed the functional assessment of Dr. Christie, Plaintiff's primary care physician, "not persuasive[,]" and rejected Dr. Christie's opinion that Plaintiff should be limited to sedentary work and would likely be off task for twenty percent of the day and absent over four days per month. She pointed out that Dr. Christie's July 2020 opinion was completed nearly one year after Plaintiff's date last insured and found this opinion "inconsistent with the longitudinal treatment record as a whole." *Id.* at 106. In a relatively cursory manner, the ALJ noted that it "find[s] little objective support in the record" and there is a lack of evidence that Plaintiff's abilities "are limited to such a substantial degree." *Id.* at 106. In contrast, the ALJ found the non-examining opinions of Drs. Geoffrey Knisely and Francis Cook, state agency physicians, "generally persuasive." *Id.*

16

Despite being the only medical opinions which the ALJ deemed generally persuasive, the opinions of Drs. Knisely and Cook are silent on nearly all of the functional limitations which were included in the RFC. The only aspects of the RFC supported by their findings are that Plaintiff should "[a]void concentrated exposure" to pulmonary irritants, *id.* at 78, 90, and that Plaintiff is capable of performing "light" work. (AR 91) (emphasis omitted). "By . . . relying on the limited findings that did not discuss the extent of Plaintiff's functional limitations . . . and provide factual basis for the RFC finding, the ALJ formulated the RFC based on [her] own reading of the bare medical evidence contained in the record." *Joyce J. v. Comm'r of Soc. Sec.*, 2022 WL 2662966, at *6 (W.D.N.Y. July 11, 2022).

Acknowledging that most of the RFC's functional limitations do not stem from the medical opinions that she found persuasive, the ALJ explained her rationale for formulating her own opinion of the medical evidence:

> [T]he undersigned finds that the claimant can reasonably be expected [to] experience postural, manipulative, and reaching deficits caused by his spine disorder, carpal tunnel syndrome, and right shoulder impairment. Therefore, employing a common[-]sense appraisal, the undersigned has added postural limitations.

(AR 106.) This "common[-]sense appraisal," however, ventures well beyond permissible lay interpretation in terms of Plaintiff's functional limitations. Dr. Christie is the only medical professional who opined regarding Plaintiff's functional limitations other than Drs. Knisley and Cook, who both failed to address nearly all of the functional limitations in the RFC. In nearly every instance, Dr. Christie recommended a more restrictive approach than the ALJ allowed.

For example, Dr. Christie determined that Plaintiff could "[n]ever" kneel and could stoop, crouch, crawl, balance, climb stairs and ladders, handle objects, finger objects, feel objects, and reach overhead "[l]ess than [o]ccasionally[.]" *Id.* at 1160. After rejecting this opinion as unpersuasive, the ALJ found that Plaintiff could "frequently balance"; climb ramps and stairs, stoop, kneel, crouch, and reach overhead "occasionally"; and "is capable of frequent handling and fingering." *Id.* at 102. No other

17

medical professional endorsed this degree of frequency. *See Otero v. Kijakasi*,³ 2022 WL 1051164, at \*22 (S.D.N.Y. Mar. 1, 2022) ("If the ALJ believes that there are sound reasons for disregarding [medical] opinions . . . then he cannot rely on those opinions (to the exclusion of the other medical opinion evidence that he supposedly finds more persuasive) to support his . . . assessment.").

Because the ALJ's "common[-]sense appraisal" of the medical evidence contradicts the only medical source who opined on the applicable functional limitations, she improperly substituted her layperson's opinion for the medical opinions of record. *See Balsamo*, 142 F.3d at 81 (holding "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion[,]" nor can he "set his own expertise against that of a physician who [submitted an opinion to or] testified before him") (internal quotation marks and citation omitted); *Heaman v. Berryhill*, 765 F. App'x 498, 500 (2d Cir. 2019) (same); *Brown v. Kijakazi*, 2022 WL 2872698, at \*2 (E.D.N.Y. July 21, 2022) (finding improper substitution of ALJ's opinion where the ALJ determined "the other evidence in the case does not support such profound limitations" and thus accorded only "some weight" to the lone medical expert that opined on Plaintiff's work-related limitations) (internal quotation marks omitted).

The Commissioner's argument that the ALJ's "common[-]sense" assessment "amply accounts" for the RFC's postural limitations does not cure the ALJ's legal error. (Doc. 7 at 11) (internal quotation marks omitted). As another court observed in similar circumstances:

> [G]iven that the RFC is fundamentally inconsistent with Dr. Balderman's opinion and the ALJ rejected every other opinion relating to Plaintiff's postural limitations, it is unclear how she concluded that Plaintiff is able to occasionally climb ramps, stairs, ladders, ropes and scaffolds, and to occasionally stoop, kneel, crouch, and crawl. Because the ALJ systematically eliminated all of the medical opinions relating to Plaintiff's physical abilities, all that remained in the record was raw medical data.

*Newark v. Comm'r of Soc. Sec.*, 2020 WL 562679, at \*5 (W.D.N.Y. Feb. 5, 2020)

---

³ Acting Commissioner's Kijakazi's name is misspelled in this case name.

(internal citations omitted); *see also Jason M. v. Comm'r of Soc. Sec.*, 2022 WL 896901, at *7 (N.D.N.Y. Mar. 28, 2022) (remanding case because the "[c]ourt [could not] discern, from the evidence in the record or the ALJ's explanation of his decision, which evidence supports an inference that Plaintiff has the ability to" meet certain exertional limitations).

The legal error in this case is not harmless. The VE testified that there would be no sedentary work available to a person who was limited to lifting ten pounds occasionally and who could never kneel. Additionally, no sedentary occupations would be available to a person who could occasionally kneel but who was also limited to only occasional handling, fingering, reaching, and feeling.

"It is the rule in our circuit that the . . . ALJ, unlike a judge in a trial, must on behalf of all claimants affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009) (internal quotation marks and alterations omitted); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (observing that an ALJ has an obligation to develop the record because "of the non-adversarial nature of . . . benefits proceedings"); *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (noting that "the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record"). "This duty exists even when the claimant is represented by counsel[.]" *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). An ALJ also has a duty to resolve "gaps in the administrative record[.]" *Hankerson v. Harris*, 636 F.2d 893, 897 (2d Cir. 1980) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). "An ALJ's failure to develop the record warrants remand." *Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017). Here, the ALJ could have elected to further develop the record regarding Plaintiff's functional limitations rather than substitute her judgment for that of the medical experts.

For the foregoing reasons, Plaintiff's motion to reverse the decision of the Commissioner is GRANTED. Because a remand is required, the court need not and does not address Plaintiff's remaining arguments for reversal. *See, e.g., Brauer v. Comm'r of Soc. Sec.*, 2019 WL 3074060, at *2 (W.D.N.Y. July 15, 2019) ("[B]ecause the [c]ourt

concludes that remand is required on one of the grounds that [plaintiff] raises, it need not address his remaining arguments.").

## CONCLUSION

For the reasons stated above, Plaintiff's motion to reverse the decision of the Commissioner (Doc. 6) is GRANTED, the Commissioner's motion to affirm (Doc. 7) is DENIED, and the case is REMANDED for proceedings consistent with this Opinion and Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 14th day of November, 2022.

Christina Reiss, District Judge
United States District Court